UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

NICHOLAS SUTTON,                         :
                                         :
                    Plaintiff,           :
                                         :        **AMENDED COMPLAINT**
        -versus-                         :
                                         :        13-CV-5855 (RRM)(SMG)
The CITY OF NEW YORK; WILLIAM            :
BRATTON, Commissioner of the New        :
York City Police Department; TIMOTHY    :
WHEELER, NYPD School Safety Agent;      :        **JURY TRIAL DEMANDED**
RUFUS FELDER, NYPD School Safety        :
Agent,                                   :
                                         :
                    Defendants.          :
-----------------------------------------------------x

## PRELIMINARY STATEMENT

1.      This lawsuit challenges the unconstitutional seizure and use of force against a

New York City public high school student by members of the School Safety Division, a branch

of the New York City Police Department (NYPD).  Plaintiff has been subjected to abuse by

School Safety Agents due to the NYPD's policies and practices regarding the seizure and use of

force against students who engage in minor misbehavior that is not criminal in nature.

2.      The NYPD School Safety Division includes over 5,000 School Safety Agents

assigned to particular public schools.  These School Safety Agents do not carry firearms, but

they wear NYPD-issued uniforms and, as peace officers employed by the NYPD, maintain full

authority to stop, frisk, detain, question, search, and arrest individuals both on and off school

grounds.  The NYPD School Safety Division also includes roughly 200 armed police officers

who are indistinguishable from the officers who patrol New York City streets, except that these

officers have been assigned to patrol New York City public schools.

3.      Members of the NYPD School Safety Division, including both School Safety Agents and police officers assigned to public schools, engage in a policy and practice of unlawfully seizing and arresting schoolchildren, in violation of the Fourth Amendment of the United States Constitution and state law.  This policy and practice manifests itself in two ways: (a) NYPD School Safety Division personnel arrest students for minor violations of school rules without probable cause of criminal activity, and detain those students off school grounds, often at police precincts; and (b) NYPD School Safety Division personnel handcuff students and detain them in seclusion rooms in school buildings for minor violations of school rules without probable cause of criminal activity.

4.      The findings of a May 2013 report of the New York City School-Justice Partnership Task Force, which was sponsored by the New York State Permanent Judicial Commission on Justice for Children, underscore the breadth of these problems.  In particular, the Task Force found that "[t]he data shows that the overwhelming majority of school-related suspensions, summonses and arrests are for minor misbehavior that occurs on a daily basis in most schools."  The lead recommendation of the Task Force, which was led by the Honorable Judith Kaye, former Chief Judge of the Court of Appeals of New York, was that a mayoral-led initiative be established with the goal of "keep[ing] more students safely in school while reducing the use of suspensions and school-based summonses and arrests."

5.      Members of the NYPD School Safety Division, including both School Safety Agents and police officers assigned to public schools, also engage in a policy and practice of using excessive force against schoolchildren.  Such excessive force includes pushing, shoving, grabbing, punching, and striking students.  In many instances, this force is not used pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a School

2

Safety Agent, or for other unjustified reasons.  These physical altercations often cause injuries to schoolchildren that, in some cases, require medical care or hospitalization.

6.          Research demonstrates that law enforcement agencies frequently fail to account for the ways in which policing students in public schools differs from policing adults on the street.  A study commissioned by the U.S. Department of Education found, "One [of] the most frequent and destructive mistakes many [] programs make is to fail to define [law enforcement's] roles and responsibilities in detail before—or even after—the officers take up their posts in schools.  When programs fail to do this, problems are often rampant in the beginning of the program—and often persist for months and even years."

7.          Such problems are endemic in New York City, where the 1998 memorandum of understanding (MOU) transferring school safety responsibilities to the NYPD failed to adequately define the roles and responsibilities of members of the NYPD School Safety Division.  This failure by the City to institute an adequate school safety governance structure is evident in the challenged policy and practice of unlawfully seizing and arresting schoolchildren absent probable cause and in the challenged policy and practice of using excessive force against schoolchildren.  Indeed, it is the stated policy of the NYPD that NYPD personnel should remove "unruly" children from New York City public schools, yet the term "unruly" has not been defined and no other limits to this policy, or protocols respecting this policy, have been enunciated.  This broad and undefined policy invites unconstitutional arrests of, and excessive force directed at, schoolchildren by the over 5,000 School Safety Agents assigned to the NYPD School Safety Division.

8.          Because the arrests made by NYPD School Safety Division personnel are often groundless, any resulting criminal cases are frequently dismissed and/or diverted to non-punitive

processes.  However, these subsequent dispositions do not mitigate the harm suffered by schoolchildren at the time of arrest and leave the children to deal with the aftermath of having missed time in class and sometimes even physical injuries.

9.      The abuses suffered by the plaintiff here resulted from the official municipal policies of the Defendants the City of New York and William Bratton (together, City-Defendants).  First, the seizures of students—by means of handcuffing, seclusion, and/or formal arrest—for minor misbehavior that falls short of probable cause of criminal activity constitutes the official stated policy of the City-Defendants.  Second, the unlawful seizures and arrests of, and use of excessive physical force against, schoolchildren constitute municipal policy because they occur with such frequency as to amount to a custom and usage of the City-Defendants.  Finally, City-Defendants' failure to appropriately train and supervise the members of the NYPD School Safety Division in order to address a known pattern of unconstitutional arrests and seizures, and the use of excessive force, amounts to deliberate indifference, thus constituting official municipal policy.

## PARTIES

Plaintiff

10.     Plaintiff Nicholas Sutton is eighteen years old.  Nicholas is enrolled as a student at W.E.B. Dubois Academic High School in Brooklyn.  At all relevant times, Nicholas was, and he continues to be, enrolled in public schools operated by the New York City Department of Education.

Defendants

11.     Defendant City of New York (referred to at times as the City) is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  The City has established and maintains the NYPD as a constituent department or agency of the City.

12.     Defendant William Bratton is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all members of the NYPD School Safety Division.  He is sued here in his official capacity.  He succeeded former Police Commissioner Raymond W. Kelly in office, and is automatically substituted in this action pursuant to Federal Rule of Civil Procedure 25(d).

13.     Defendant School Safety Agent Timothy Wheeler is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

14.     Defendant School Safety Agent Rufus Felder is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

## MARCH 13, 2013, INCIDENT

15.     On March 13, 2013, Nicholas was eighteen years old and newly enrolled at W.E.B. DuBois Academic High School in Brooklyn when he was physically assaulted and illegally detained by School Safety Agents.

16.     During his lunch period that day, Nicholas was verbally arguing with another student in a nearly-empty classroom over a game.  A teacher, who was the only individual in the

classroom besides Nicholas and the other student, instructed Nicholas to leave the classroom.
Nicholas complied by moving toward the classroom door.

17.     Defendant NYPD School Safety Agent Rufus Felder entered the classroom as
Nicholas attempted to leave.  School Safety Agent Felder ordered Nicholas into the hallway
without explanation, and Nicholas complied.  A second School Safety Agent, Defendant
Timothy Wheeler, was waiting at the classroom door.

18.     Once in the hallway Nicholas explained to Defendants Felder and Wheeler that
he had done nothing wrong and asked to be left alone.  Defendants Felder and Wheeler moved
forward aggressively toward Nicholas as he asked the school principal, who was standing
nearby, to explain what was happening.  Defendants Felder and Wheeler blocked Nicholas from
moving and prevented his egress.

19.     In response, Nicholas threw his hat to the ground in frustration.  When Nicholas
reached down to pick up the hat, Defendant Wheeler pushed Nicholas from behind, causing him
to lose his balance and stumble forward.  Nicholas regained his balance and turned toward the
School Safety Agents, keeping his hands at his sides, and said "get off me."

20.     Defendant Felder then grabbed one of Nicholas's arms, while Defendant
Wheeler grabbed Nicholas around his neck.  Both School Safety Agents began to forcefully pull
on Nicholas's body—one from in front of him and one from behind—as they shoved him
repeatedly against a wall.

21.     At no time during this physical assault did the School Safety Agents tell
Nicholas he was under arrest.  Nicholas did not know why Defendants Wheeler and Felder were
shoving, grabbing, and pulling him.

22.     Even though Defendants Felder and Wheeler were in total control of Nicholas's arms and hands, they then tackled Nicholas.  All three went to the floor.

23.     Nicholas was struck in the temple area as the two men pinned him on the hallway floor.  Defendants Felder and Wheeler continued to physically grab and pull on Nicholas's body as they lay atop him.

24.     While Nicholas remained on the floor, one of the School Safety Agents handcuffed him.   Once the handcuffs were secured, Defendant Felder forcefully yanked upward on Nicholas's handcuffed arms several times, telling Nicholas to get up when it was physically impossible to do so and causing Nicholas severe pain.

25.     Defendants Wheeler, Felder, and a third School Safety Agent eventually assisted Nicholas to his feet and walked Nicholas toward a stairwell, where Nicholas complained that his handcuffs were too tight and that he was in pain.  The third School Safety Agent responded by yanking Nicholas down the stairs so that he stumbled repeatedly, and slammed Nicholas against the stairwell wall several times.

26.     Nicholas was then placed in a room on the first floor of the school to await uniformed officers from the 71st Precinct who had been summoned to formally arrest Nicholas. Nicholas was in pain as he waited; he was bleeding from his head and had sustained bruises to his body.  His repeated complaints that his handcuffs were too tight and his wrists were hurting were ignored by School Safety Agents.

27.     Two uniformed NYPD officers arrived at DuBois High School and transported Nicholas to the 71st Precinct where he was placed in a cell with his arms handcuffed behind his back.

28.     The principal at Nicholas's school called Nicholas's mother to inform her that Nicholas had been arrested and was being transported to the 71st Precinct shortly after Nicholas was removed.  She immediately went to the 71st Precinct.

29.     At the 71st Precinct, Nicholas was still bleeding from his head and his wrists were hurting.  Nicholas informed numerous officers at the precinct that he needed medical attention.  Although EMTs were called, the officers discouraged Nicholas from seeking medical attention for his injuries several times, telling him he was just dragging out the process by requesting treatment.

30.     Nicholas's mother arrived at the precinct and saw her son's bleeding head as Nicholas was escorted past her.  She begged the precinct desk officer to let her speak with her son, specifically pointing out his injuries to the officer, but was sternly refused.  Concerned for her son's safety, Nicholas's mother frantically asked the arriving EMTs to assist Nicholas.

31.     Nicholas was transported by EMTs from the 71st Precinct to New York Methodist Hospital by ambulance.  Nicholas was not allowed to see or speak with his mother at the hospital when she arrived, and Ms. Sutton was again admonished by NYPD personnel to stay away from her son and not to talk to him as she waited just outside the exam room.  Nicholas remained in handcuffs for almost the entire time he was at the hospital, approximately two to three hours.

32.     When Nicholas was discharged from the hospital, he was transported back to the 71st Precinct where his arrest processing was completed.  He was still in handcuffs and his head still bloody.  Nicholas was never allowed to call or speak to his mother or anyone else while at the precinct, despite his repeated requests to make a phone call.

33.     Nicholas was eventually transported to Central Booking.  Around midnight, Nicholas was arraigned on three criminal charges: disorderly conduct, harassment in the second degree, and resisting arrest.  Nicholas pled not guilty to all charges.

34.     Nicholas was released on his own recognizance at approximately 2:00 a.m. on March 14, 2013.  When Nicholas arrived home—for the first time since he left for school on the morning of March 13, 2013—his mother insisted that Nicholas return to New York Methodist Hospital to receive appropriate treatment for his head wound, which was still bleeding.

35.     Nicholas again received medical treatment at New York Methodist Hospital for the laceration to his head, and finally made it home for the day at approximately 4:00 a.m. on March 14, 2013.

36.     W.E.B. DuBois High School did not pursue any disciplinary action against Nicholas in connection with the incident on March 13, 2013.  Nicholas returned to school on March 15, 2013.

37.     All criminal charges against Nicholas were dismissed on September 9, 2013.

38.     On June 7, 2013, Nicholas served a notice of claim upon the Comptroller of the City of New York regarding his arrest on March 13, 2013, pursuant to Section 50-e of the New York General Municipal Law.

39.     Although Nicholas is afraid that School Safety Agents may harass, attack, or falsely arrest him again, he remains committed to finishing high school.

**FACTS ESTABLISHING OFFICIAL MUNICIPAL POLICY**

40.     Since 1998, the NYPD School Safety Division has had authority to patrol the buildings and grounds of public schools operated by the New York City Department of Education and to engage in policing activities with respect to those schools.  The School Safety

Division includes approximately 200 uniformed police officers assigned to patrol public schools who carry handguns, nightsticks, and other weapons during the course of their normal duties at schools.  In addition, the NYPD School Safety Division includes over 5,000 School Safety Agents assigned to patrol specific school sites.  Upon information and belief, the NYPD School Safety Division assigns between three and eight School Safety Agents to each New York City public middle school and high school.

41.     School Safety Agents wear NYPD-issued uniforms and, as peace officers, maintain full authority to stop, frisk, detain, question, search, and arrest individuals both on and off school grounds.  School Safety Agents do not carry firearms, but they do carry handcuffs.

42.     Unlike other NYPD police officers who ordinarily receive six months of training prior to being deployed to city streets, School Safety Agents receive only fifteen weeks of training prior to being deployed to New York City public schools.

43.     Members of the NYPD School Safety Division have a practice of subjecting New York City public school students to unlawful seizures and arrests by:  (a) arresting students for minor violations of school rules without probable cause of criminal activity, and removing and holding those students off school grounds, often at police precincts; and (b) handcuffing students and detaining them in seclusion rooms in school buildings, for minor violations of school rules without probable cause of criminal activity.  In addition, a significant number of schoolchildren under the age of sixteen have been arrested at school for allegedly having committed non-criminal violations even though such arrests are prohibited by state law.

44.     Members of the NYPD School Safety Division also have a practice of using excessive force against schoolchildren.  Such excessive force includes pushing, shoving, grabbing, punching, and striking students.  In many instances this force is not used pursuant to a

lawful arrest, but rather for the purpose of securing compliance with a directive from a School

Safety Agent or for other unjustified reasons.  These uses of force often cause injuries to

schoolchildren that, in some cases, require medical care or hospitalization.

45.     The unlawful seizure of and use of force against Plaintiff Nicholas Sutton on

March 13, 2013, is not an isolated incident.  Rather, it is an example of widespread practices

within the New York City public schools and results from official municipal policies.

46.     The policy and practice of unlawfully seizing and arresting students for minor

school misbehavior without probable cause of criminal activity is the official stated policy of the

NYPD, which broadly authorizes law enforcement personnel to remove "unruly" children from

schools.  In addition, both challenged policies and practices—the unlawful seizures and arrests

of, as well as the use of excessive force against, schoolchildren—are so widespread and frequent

as to constitute a custom and usage of members of the NYPD School Safety Division.  City-

Defendants were well aware of, yet deliberately indifferent to, the prevalence of the challenged

policies and practices, failing to make meaningful attempts to improve the training and

supervision of members of the NYPD School Safety Division.  For each of these reasons, the

policies and practices here are directly attributable to City-Defendants.

## Official Stated Policy

47.     The policy and practice of unlawfully seizing and arresting schoolchildren for

minor misbehavior without probable cause of criminal activity constitutes the official policy of

the City, as set forth by former Police Commissioner Raymond W. Kelly and the former

Commanding Officer of the NYPD School Safety Division, James Secreto, both of whom have

had final decision-making authority in these matters.

11

48.     On June 11, 2007, Commissioner Kelly submitted a letter to New York City Councilmember Robert Jackson indicating that the duties of School Safety Agents include "removing unruly students" and "enforc[ing] the rules and regulations" of the "Student Disciplinary Code."

49.     Likewise, on October 10, 2007, James Secreto, then an Assistant Chief and the Commanding Agent of the NYPD School Safety Division, submitted a written statement to the New York City Council, stating that School Safety Agents are responsible for "removing unruly students from public schools."

50.     In this context, the removal of an "unruly" student by members of the NYPD School Safety Division constitutes a seizure and/or an arrest; students are not free to leave once seized and/or arrested, and often they are transported to a local police precinct even when they have done nothing more than arguably violate school rules in a non-criminal matter.  In addition, although neither Commissioner Kelly nor Secreto further defined the term "unruly," as a matter of logic and plain language, the term encompasses minor misbehavior that does not amount to probable cause of criminal activity.

51.     The concept of taking police action against unruly students has been articulated by former Mayor Bloomberg as well.  Specifically, in a December 23, 2003, press release, announcing the creation of the "Impact Schools" program, Mayor Bloomberg stated, "Just as the NYPD has successfully preempted major crimes by paying close attention to areas with frequent minor quality of life offenses, the new school safety plan will focus on areas where there is frequent disorderly behavior, such as cursing or taunting other students, which can create an atmosphere conducive to more serious incidents."

52.     In these ways, the policy and practice of unlawfully seizing and arresting schoolchildren for minor school misbehavior, absent probable cause of criminal activity, constitutes official municipal policy, as articulated by officials with final decision-making authority in these matters.

53.     Pursuant to the NYPD's official policy that permits the removal of "unruly students," NYPD personnel seize—by means of handcuffing or otherwise physically restraining—New York City public schoolchildren in circumstances under which such seizures are barred in schools operated by New York State.  In stark contrast to the NYPD's policy, the state regulation governing the use of physical restraints in state-operated schools explicitly prohibits handcuffing a student unless she poses an imminent physical threat to herself or to others.

54.     Similarly, the NYPD's policy on the removal of "unruly students" violates the New York State law that explicitly bans taking into custody minors under the age of sixteen for non-criminal violations.

### Custom and Usage

55.     The experience of Plaintiff Nicholas Sutton is by no means unique or anomalous.  Rather, it is representative of widespread and frequent actions by members of the NYPD School Safety Division.  They occur as part of a larger pattern and practice of unlawfully seizing and arresting students absent probable cause and of using excessive force against schoolchildren, which is so prevalent as to amount to a custom and usage of City-Defendants.

56.     According to the NYPD's own statistics, at least 579 arrests were made and 788 summons issued at schools during the roughly 200 school days that composed the 2012-2013 school year.  Disorderly conduct, obstruction of governmental administration, or resisting arrest

was the top charge in 15 percent of the arrests, and disorderly conduct charges accounted for nearly 60 percent of all of the summonses.

57.     The existence of this custom and usage is underscored by reference to the remarkable number of complaints that are filed against School Safety Agents.  On June 11, 2007, Commissioner Kelly reported to New York City Councilmember Robert Jackson in a letter that, since 2002, the City had received 2,670 complaints against School Safety Agents, an average of 500 per year.  Moreover, Commissioner Kelly noted in the letter that 27 percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against regular NYPD police officers.

58.     More recently, on November 10, 2009, James Secreto, then the Commanding Agent of the NYPD School Safety Division, testified before the New York City Council that during the 2008 calendar year, there had been 1,159 complaints filed against School Safety Agents.  This figure represents a staggering rate of almost one complaint for every four School Safety Agents.  Former Assistant Chief Secreto further explained that 15 percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Agents.

59.     In a February 22, 2011, letter, Commissioner Kelly reported to City Council Speaker Quinn that in the first 11 months of 2010, the City had received 1,187 complaints of misconduct by School Safety Agents.  Assuming that the City employed between 4,000 and 5,000 School Safety Agents during this period, these figures indicate that one complaint had been filed for approximately every four School Safety Agents that year.

60.    Moreover, upon information and belief, these figures vastly underestimate the number of complaints that could have been lodged against School Safety Agents.  As stated during a New York City Council hearing on the NYPD School Safety Division held in 2007, and as set forth in a report published by the New York Civil Liberties Union and the American Civil Liberties Union submitted to City-Defendants in 2007, many parents have been given improper information as to how to file a complaint regarding the conduct of a School Safety Agent.  For example, the report documents confusion among 311 operators, who directed calls to the Department of Education rather than the NYPD.

61.    Kathleen Nolan, an urban education expert and Princeton University lecturer, undertook an intensive study of disciplinary practices at a Bronx high school during the 2004-2005 school year.  Nolan's findings underscore the frequency with which School Safety Division personnel respond to mere violations of school rules by seizing students, including by means of handcuffing.  In the course of her research, Nolan spent approximately five hours per day at the school, several days per week, during which time she observed interactions among students and School Safety Division personnel in the school's hallways, cafeteria, deans' office, and detention room.  Nolan published her findings in a 2011 book, *Police in the Hallways: Discipline in an Urban High School*.

62.    Nolan concluded that low-level infractions of the Department of Education's Discipline Code, particularly a student's insubordination during an exchange with an adult, often led to police intervention.   She also concluded that "the issuance of a summons or an arrest for disorderly conduct appeared to be justified in the eyes of law-enforcement officials and deans by a student's display of 'irate,' 'insubordinate,' 'disrespectful,' 'uncooperative,' or 'uncontrollable' behavior."

63.     Nolan frequently observed School Safety Division personnel escort handcuffed students to the deans' office.  She also witnessed School Safety Division personnel "rounding up" all students who were in close proximity of lunchroom fights, even if they were simply bystanders.

64.     To explore these issues systematically, Nolan reviewed all reports for the school entered into the Department of Education's Online Occurrence Reporting System (OORS reports) for the 2004-2005 school year.  In general, OORS reports are generated in connection with serious incidents in schools.  Of the 221 OORS reports Nolan reviewed, 52 percent concerned "disorderly conduct."

65.     Additional incidents underscore the systematic nature of the abuses suffered by schoolchildren in New York City public schools and provided City-Defendants with notice of the ongoing practices challenged here.

66.     At City Council hearings in 2007 and 2009, testimony was offered regarding the unlawful seizures, arrests, and beatings of a number of children—including A.P., C.S., S.C., Legal Aid Society clients, and a Queens Legal Services client—by members of the NYPD School Safety Division.

67.     Further, in recent years, notices of claim and lawsuits have been filed against the City of New York and/or individual School Safety Agents alleging that public school students have been subjected to unlawful seizures and/or the use of excessive force in at least 37 separate incidents.

School Safety Division Investigations Unit Complaints

68.     When an individual files a complaint about School Safety Division personnel, those complaints are typically directed to the School Safety Division Investigations Unit.

Between January 2007 and July 2010, the School Safety Division Investigations Unit conducted at least 160 investigations into allegations of unlawful seizure, unconstitutional arrests, or use of excessive force by School Safety Division personnel.  Many of the complaints stemmed from incidents that allegedly resulted in substantial physical and psychological suffering by students and other members of the school community.  Illustrative examples include:

      a.     Student A filed a complaint with the School Safety Division Investigations Unit claiming that a School Safety Agent at a high school in the Bronx grabbed her backpack and slammed her against a wall in 2007.  Student A claimed that the School Safety Agent then demanded that she produce her identification, but before she could reach it, the School Safety Agent began choking her.  According to Student A, when she tried to break the chokehold, the School Safety Agent slammed her against the wall again, causing her to fall.  The day after the assault, Student A sought medical treatment for back and neck pain and a significant cut on her right ear lobe.

      b.     Student B filed a complaint with the School Safety Division Investigations Unit claiming that School Safety Division personnel at a second high school in the Bronx threw him on a table and kicked and hit him in the face and head in a room without surveillance cameras.  Student B alleged that during the attack, a School Safety Division supervisor instructed the other School Safety Division personnel to "break his arm and put him in handcuffs."  As a result of the assault, Student B sustained fractures to his right wrist and finger, cuts to both wrists, and a cut below his ear.

      c.     According to a complaint filed with the School Safety Division Investigations Unit, a School Safety Agent ordered Student C to stop when she was leaving a third high school in the Bronx one afternoon.  Student C, an 80-pound girl,

claimed that the School Safety Agent grabbed her, shoved her, slammed her to the ground, and pushed his knee into her back.  According to the complaint, a School Safety Division supervisor who responded to the scene noted that the School Safety Agent had used excessive force.  Following the assault, Student C was treated at a local hospital. When Student C returned to the school, the School Safety Agent threatened that if Student C looked at him again, he would knock her out.

       d.     The mother of Student D filed a complaint with the School Safety Division Investigations Unit alleging that in 2008, a School Safety Agent at a high school in Brooklyn seized and handcuffed her son for being in the hallway during a "hallway sweep."  According to the mother, Student D was taken to the principal's office, where the School Safety Agent first instructed him to produce his identification card and then cut up the card and again ordered Student D to produce his identification card.

       e.     An assistant principal at a fourth high school in the Bronx filed a complaint with the School Safety Division Investigations Unit claiming that a School Safety Agent physically prevented Student E from going to class in 2009.  The assistant principal claimed that the School Safety Agent threw Student E against an iron fence and handcuffed him when Student E tried to pass the School Safety Agent.  As a result of the assault, Student E sustained a contusion to the head.  The assistant principal reported that a School Safety Division lieutenant had described the particular School Safety Agent as "no good."

       f.     According to a 2009 complaint transferred to the School Safety Division Investigations Unit, Student F was assaulted by a School Safety Agent after she set off a metal detector at a high school in Brooklyn.  Student F claimed that School Safety Agents

rushed her, pulled her backpack, and grabbed her arms.  Although another student warned

the School Safety Agents that Student F was prone to seizures, the School Safety Agents

allegedly continued to push and grab Student F, and one grabbed Student F's hair and

pulled it "almost out of the roots," causing her scalp to turn red and swell.  Student F

alleged that she was detained in handcuffs for about an hour, and during that time, School

Safety Agents unzipped her pants, unlaced her sneakers, pulled on her bra, and hit her

breasts.  Following the attack, Student F suffered from tingling in her fingers, numbness

in her wrists and hands, and headaches.

        g.      The principal at a fifth high school in the Bronx filed a complaint with the

School Safety Division Investigations Unit alleging that a School Safety Agent attacked

Student G, a student with special needs, choking him and repeatedly slamming him

against the wall after the student paced between the cafeteria and an outside yard.  When

the principal arrived, the School Safety Agent and other School Safety Division

personnel refused to allow her to intervene and help the student.

        h.      The mother of Student H filed a complaint with the School Safety

Division Investigations Unit alleging that in 2010, a School Safety Agent attacked her

daughter in the auditorium of an intermediate school in the Bronx after Student H had a

panic attack in front of the 300 assembled students.  According to the complaint, the

School Safety Agent grabbed Student H by the throat, slammed her against the wall, and

threw her to the floor, causing a concussion and a black eye.  Student H's father claimed

that when he tried to report the assault, officers at two different precincts refused to take

the complaint and instead dismissed him without providing the procedure for filing a

complaint against a member of the School Safety Division.

i. According to a complaint filed with the School Safety Division Investigations Unit, in 2010, a School Safety Agent attacked Student I, who was en route to the nurse's office with a hallway pass from a teacher.  Student I claimed that the School Safety Agent said that he did not care about the pass and that he "did not want to see [Student I's] face," and then grabbed Student I by the collar and slammed the student into the wall.  The complaint alleged that the School Safety Agent wrapped his arms around Student I and asked "Do you know who you are messing with?" before dragging Student I into the security room and slapping the student's face.  Student I's complaint stated that the School Safety Agent went through Student I's backpack and wallet and then instructed Student I to write out a statement.  According to the complaint, the School Safety Agent then accused Student I of trying to stab him with a pen and asked if Student I understood how easy it would be for the School Safety Agent to get Student I in trouble. The complaint states that School Safety Agent only released Student I when Student I complained about difficulty breathing.  Following the attack, Student I was transported to the hospital by emergency services.

j. Student J filed a complaint with the School Safety Division Investigations Unit alleging that in 2010 a School Safety Agent grabbed and choked him in the hallway of the same Bronx high school in Paragraph 68a, *supra*.  According to the complaint, when Student J asked why the School Safety Agent had choked him, the School Safety Agent replied "I can do that."

## Deliberate Indifference in Failure to Train and Supervise

69. City-Defendants have been aware of the incidents described above and the pervasive nature of the pattern and practice by members of the NYPD School Safety Division of

unlawfully seizing and arresting schoolchildren, and the pattern and practice of subjecting them to excessive force.  Yet, City-Defendants have been deliberately indifferent to these patterns and practices, and have not attempted to remedy them.

70.     City-Defendants also have had actual knowledge of these patterns and practices for several years from sources other than those described above.  In March 2007, the New York Civil Liberties Union and the American Civil Liberties Union published a report titled *Criminalizing the Classroom: The Over-Policing of New York City Schools*, documenting instances of abuses by members of the NYPD School Safety Division.

71.     The *Criminalizing the Classroom* report documented numerous abuses by members of the School Safety Division, including at least five unlawful seizures of and/or and uses of force against students for minor misbehavior.

72.     City-Defendants and all senior personnel within the NYPD School Safety Division received copies of the *Criminalizing the Classroom* report.  At a May 2007 meeting, Douglas Zeigler, then-Chief of the NYPD Community Affairs Bureau, within which the School Safety Division is located, acknowledged that all senior personnel within the NYPD School Safety Division had read the *Criminalizing the Classroom* report.

73.     Commissioner Kelly was also informed of unlawful seizures and the use of excessive force against public schoolchildren at an August 2009 meeting held at the NYPD's headquarters.  Others in attendance at the meeting included then-NYPD Deputy Commissioner for Legal Matters, Andrew Schaeffer, New York State Senator Bill Perkins, and Udi Ofer, then-Advocacy Director of the New York Civil Liberties Union.  During the meeting, Mr. Ofer informed Commissioner Kelly of numerous arrests of public school students by NYPD School Safety Agents that took place even though the students had not engaged in criminal conduct.  Mr.

Ofer also described uses of excessive force against public schoolchildren by School Safety Agents.  Commissioner Kelly responded by saying that such abuses were attributable to a few "bad apples," and did not reveal any systemic problems.

74.     City-Defendants obtained further knowledge of the challenged patterns and practices through the publication of other reports documenting abuses by members of the NYPD School Safety Division.  *See, e.g.*, Drum Major Institute for Public Policy, *A Look at the Impact Schools* (June 2005); Kevin P. Brady, Sharon Balmer and Deinya Phenix, *School-Police Partnership Effectiveness in Urban Schools: An Analysis of New York City's Impact Schools Initiative* (Education and Urban Society, Aug. 2007); National Education and Social Rights Initiative and Teachers Unite, *Teachers Talk: School Culture, Safety, and Human Rights* (Oct. 2008); and Urban Youth Collaborative, *Bill of Rights* (2006).

75.     City-Defendants also obtained actual knowledge of the pattern and practice by members of the NYPD School Safety Division of unlawfully arresting schoolchildren based on letters submitted by the American Civil Liberties Union and the New York Civil Liberties Union to Commissioner Kelly dated October 7, 2008 and November 4, 2008.  These letters documented that a significant number of schoolchildren under the age of sixteen have been arrested at school for non-criminal violations, even though such arrests are prohibited by state law.

76.     City-Defendants also obtained actual knowledge of the patterns and practices challenged here from media reports.  In addition to widespread coverage of numerous incidents described above, the *New York Daily News* reported on June 19, 2008, that a School Safety Agent handcuffed a five-year-old boy and transported him to a psychiatric hospital, without parental consent, after the boy threw what was described as a "temper tantrum."  Likewise, on March 10, 2008, the *New York Daily News* reported that a School Safety Agent handcuffed two

22

four-year-old boys for refusing to take a nap.  On January 30, 2013, the *New York Daily News* published an article describing the handcuffing, ten-hour detention, and arrest of 7-year-old W.R. from his elementary school classroom following a scuffle with another student.  Similarly, on June 7, 2013, the *New York Daily News* reported that a School Safety Agent at a Bronx middle school threw a 13-year-old student into an office, pinned him to the ground, and handcuffed him because he refused to enter the school cafeteria.

77.     City-Defendants also obtained actual knowledge of the patterns and practices challenged here from complaints filed with the NYPD regarding conduct by members of the NYPD School Safety Division.  As described *supra* Paragraph 57, between 2002 and 2007, the police received 2,670 complaints against School Safety Agents, which is an average of 500 per year, or one complaint for every eight to ten School Safety Agents per year.  Twenty-seven percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against NYPD police officers not assigned to the public schools.

78.     Also, as described more fully *supra* Paragraph 58, during the 2008 calendar year, there were 1,159 complaints filed against School Safety Agents, representing a staggering rate of almost one complaint for every four School Safety Agents employed.  Fifteen percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Agents.

79.     Also as described *supra* Paragraph 59, during the first eleven months of the 2010 calendar year, there were at least 1,187 complaints of misconduct filed against School Safety Agents.  As in earlier years, the 2010 figures represented one complaint for approximately every four School Safety Agents.  More than seventeen percent of these complaints alleged

excessive force, abuse of authority, discourtesy, or use of offensive language by School Safety Agents.

80.     In the 2011, there were 215 complaints alleging excessive force, abuse of authority, discourtesy, or use of offensive language by School Safety Agents.  Of those complaints, 70 percent alleged excessive force, and at least 12 percent of those cases were substantiated.

81.     City-Defendants also obtained actual knowledge of the patterns and practices challenged here from notices of claims, civil actions, and complaints filed regarding the conduct of members of the NYPD School Safety Division.  As described above, *supra* Paragraph 67, notices of claims, civil actions, and complaints allege that unlawful seizures, arrests, and/or physical assaults took place in at least 37 separate incidents.

82.     City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on October 10, 2007, regarding the NYPD School Safety Division.  NYPD Assistant Chief James Secreto, then the Commanding Officer of the School Safety Division, was present at this hearing and testified on behalf of himself and Commissioner Kelly.  At that hearing, a number of children offered testimony regarding abuses suffered at the hands of School Safety Agents as described above.  At the same hearing, Gregory Floyd, the president of the union representing all School Safety Agents, testified that he agreed with the statement that "we need to have more mediation training, more conflict resolution, knowing [*sic*] how to diffuse [*sic*] situations among not only staff and teachers and administrators, but also for     students . . . ."

83.     City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on November 10, 2009, regarding

24

the NYPD School Safety Division.  NYPD Assistant Chief James Secreto, then the Commanding

Officer of the School Safety Division, was present at this hearing and testified on behalf of

himself and Commissioner Kelly.  As described above, *supra* Paragraph 58, during that hearing,

testimony was offered regarding the unlawful seizures, arrests, and beatings of a number of

children by members of the NYPD School Safety Division.

84.     In addition, during that same hearing, a representative from the National

Economic and Social Rights Initiative (NESRI) reported the results of a survey of New York

City public school parents and teachers that the organization had conducted.  NESRI concluded

that "Safety Agents are inappropriately involved in disciplinary matters that should be dealt with

by school staff."  NESRI further reported that "Students [it] interviewed had been harassed,

handcuffed, patted down and in some cases arrested for shouting in hallways, being late to

school or class, [sic] talking back to a safety employee."

85.     Similarly, the President of the United Federation of Teachers, Michael

Mulgrew, testified during the November 10, 2009 hearing as follows: "If a student is disruptive

inside of a classroom, and the school has a real safety plan, there's a way for them to remove

them without using a safety agent.  But in too many places, what they'll do is wait till [sic] the

situation's getting out of control, they bring in a safety agent, and the next thing you know a

student's getting arrested when nobody wants a student being arrested.  You should not be

arrested for, you know, having a bad day in school.  Let's be clear.  You shouldn't be."

86.     Notwithstanding this detailed knowledge of the patterns and practices

challenged here, City-Defendants have failed to undertake any meaningful attempt to curtail

these patterns and practices, in blatant disregard of the rights of New York City public

schoolchildren.

25

87.     The 1998 MOU transferring school safety responsibilities to the NYPD created

the Joint Committee on School Safety (Joint Committee) to "ensure the effectiveness of the

[school safety] program . . . by developing appropriate programmatic recommendations,

modifications or improvements."  The Joint Committee published its first annual report in

November of 2000, in which it stated that its purpose was "to explore ways to improve this

[school safety] program, address issues that have local and system-wide implications and make

recommendations to the Joint Committee regarding policy issues."  Among other content, the

report includes the Joint Committee's "recommendations for future initiatives."  Four years later,

in the 2004 Annual Report, the Joint Committee declared that "[e]valuation of school safety

citywide will continue."  Nonetheless, the Joint Committee's current role is largely limited to

"analyzing aggregate data," according to Michele Sviridoff, the Deputy Criminal Justice

Coordinator for Research and Planning for the New York City Criminal Justice Coordinator.

The limited function of the Joint Committee leaves a void in evaluating, modifying, and

improving the school safety program.

88.     City-Defendants have actively resisted efforts to provide public information to

parents and students who seek to file complaints.  In particular, they have refused to support a

requirement that schools post information regarding the filing of a complaint against School

Safety Agents, even knowing that 311 operators often direct complainants to the Department of

Education or the Civilian Complaint Review Board, which have no authority over School Safety

Agents.

89.     Upon information and belief, the current training does not include sufficient

instruction on the enforcement of the Penal Code as distinct from the New York City Department

of Education's Citywide Standards of Discipline and Intervention Measures (the Discipline

Code).  In fact, School Safety Agents describe their job duties and responsibilities to include

"apprehending students and others violating Department of Education Rules and Regulations."

*Floyd et al. v. City of New York*, No. 10-cv-02426, Compl. ¶ 35(h) (S.D.N.Y. filed Mar. 17,

2010).

90.     Further, the current training program for School Safety Agents does not include

sufficient instruction on the differences between typical student misbehavior that School Safety

Agents are likely to encounter and non-criminal offenses, such as disorderly conduct and

harassment in the second degree.

91.     The NYPD Patrol Guide, the official set of NYPD policies, is equally

insufficient in providing guidelines and standards that incorporate the cognitive, behavioral, and

developmental needs of children.  It does not adequately prepare School Safety Division

personnel to distinguish between policing tactics that are appropriate for the school environment

as opposed to those used on the streets.

92.     The training is also inadequate with respect to issues of adolescent development

and behavior, as well as the unique environment of a school.  The Department of Education does

not play any significant role in training School Safety Agents or ensuring that members of the

School Safety Division are sufficiently prepared to interact with students in the school

environment.

93.     Nor does the training include instruction in mediation and conflict resolution,

despite indications by individuals such as Gregory Floyd, *supra* Paragraph 89, that such topics

should be addressed.  Rather, the training manual, entitled Police Academy School Safety –

Police Science, characterizes schoolchildren as "extremely violent" and warns School Safety

Agents of "a ticking youth time bomb."

27

94.     Moreover, City-Defendants adopted a policy that allows School Safety Division personnel nearly unbounded discretion to employ Velcro handcuffs against schoolchildren without adequately evaluating the policy or training School Safety Division personnel.  The policy is insufficiently detailed and imposes only a "common sense standard" on School Safety Division personnel considering whether to use restraining devices.

95.     City-Defendants have refused to discipline adequately offending School Safety Agents who commit abuses.  They have failed to remove School Safety Agents who are demonstrably unable to work with children in a safe and effective manner.  Upon information and belief, in several instances, City-Defendants have responded to complaints of abuse on the part of NYPD School Safety Division personnel by transferring the personnel to other public school sites.

96.     The City fails to supervise School Safety Agents in part because it relies on inadequate investigations by the School Safety Division Investigations Unit to determine whether to discipline School Safety Agents who have been accused of improperly seizing or using excessive force against schoolchildren.  The School Safety Division Investigations Unit investigates the vast majority of complaints involving allegations of improper seizures, uses of force, and similar abuses by School Safety Agents.

97.     Upon information and belief, investigations conducted by the School Safety Division Investigations Unit are inadequate in the following ways: at times the School Safety Division Investigations Unit does not seek to interview students who witnessed alleged misconduct in all instances where such students are available, does not seek in all instances to review transcripts of suspension hearings where School Safety Agents under investigation and other witnesses to alleged misconduct have testified, and does not in all instances review video

surveillance in the public areas of schools, such as hallways and cafeterias, that may capture the events in question.  In light of the School Safety Division Investigations Unit's inadequate investigations of alleged misconduct by School Safety Agents, School Safety Agents are not disciplined appropriately, and sometimes not at all, when they violate the rights of schoolchildren to be free from unconstitutional seizures and the use of excessive force.

98.     In sum, City-Defendants know to a moral certainty that members of the NYPD School Safety Division will be called upon to address situations—involving  the seizure of, detention of, handcuffing of, or physical contact with, New York City public schoolchildren—in which the constitutional, statutory, and common law rights of the schoolchildren will be implicated.  Although there is a history of members of the NYPD School Safety Division mishandling such situations, as described *supra* Paragraphs 69-97, City-Defendants have failed to undertake sufficient efforts to train and supervise members of the NYPD School Safety Division to avoid violations of schoolchildren's rights.  Appropriate training would improve the ability of members of the NYPD School Safety Division to make choices that prevent violations of schoolchildren's rights.  Without appropriate training, members of the NYPD School Safety Division will frequently continue to make choices that lead to the deprivation of schoolchildren's rights.

## JURISDICTION AND VENUE

99.     This action is authorized by 42 U.S.C. §1983.  Subject matter jurisdiction for Plaintiff's federal claims rests upon 28 U.S.C. §§ 1331 and 1343(a)(4).  This court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

100.     The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

101.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as this is a district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

### CAUSES OF ACTION

FIRST CAUSE OF ACTION:  UNLAWFUL SEIZURE AND ARREST IN VIOLATION OF THE FEDERAL CONSTITUTION

102.     Plaintiff incorporates herein by reference Paragraphs 1 through 98.

103.     Defendants are liable pursuant to 42 U.S.C. § 1983 for the unlawful seizure and arrest of Plaintiff Nicholas Sutton in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

SECOND CAUSE OF ACTION:  EXCESSIVE FORCE IN VIOLATION OF THE FEDERAL CONSTITUTION

104.     Plaintiff incorporates herein by reference Paragraphs 1 through 98.

105.     Defendants are liable pursuant to 42 U.S.C. § 1983 for the use of excessive force against Plaintiff Nicholas Sutton in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

THIRD CAUSE OF ACTION:  SUBSTANTIVE DUE PROCESS

106.     Plaintiff incorporates herein by reference Paragraphs 1 through 98.

107.     Defendants are liable pursuant to 42 U.S.C. § 1983 for abuses against Plaintiff Nicholas Sutton that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

FOURTH CAUSE OF ACTION:  UNLAWFUL SEIZURE AND ARREST IN VIOLATION OF THE NEW YORK STATE CONSTITUTION

108.     Plaintiff incorporates herein by reference Paragraphs 1 through 98.

109.    Defendants are liable pursuant to Article I §12 of the New York Constitution for the unlawful seizure and arrest of Plaintiff Nicholas Sutton.

### FIFTH CAUSE OF ACTION:  FALSE ARREST IN VIOLATION OF NEW YORK LAW

110.    Plaintiff incorporates herein by reference Paragraphs 1 through 98.

111.    Defendants are liable for the false arrest of Plaintiff Nicholas Sutton in violation of New York law.

### SIXTH CAUSE OF ACTION:  ASSAULT IN VIOLATION OF NEW YORK LAW

112.    Plaintiff incorporates herein by reference Paragraphs 1 through 98.

113.    Defendants are liable for the assault of Plaintiff Nicholas Sutton in violation of New York law.

### **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff respectfully requests that the Court:

114.    Assume jurisdiction over this matter;

115.    Award compensatory damages for injuries sustained by Plaintiff;

116.    Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

117.    Grant any other relief the Court deems necessary or proper.

Dated this 6th day of January, 2014.

Respectfully submitted,


   s/ Alexis Karteron

ALEXIS KARTERON, ESQ.
ARTHUR N. EISENBERG, ESQ.
BROOKE MENSCHEL, ESQ.
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
akarteron@nyclu.org


LAURENCE M. SCHWARTZTOL, ESQ.
DENNIS D. PARKER, ESQ.
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7849


Attorneys for Plaintiff